ERVIN, Justice
(agreeing in part and dissenting in part).
In this appeal it appears Chapter 63-200 established new boundaries for Glades, Hen-dry, Okeechobee, Martin and Palm Beach-Counties. The effect was to reduce the-area of Palm Beach County in Lake-Okeechobee by giving portions of said area, to the other four counties.
Appellants attacked the constitutionality of Chapter 63-200 and additionally challenged the effect it had upon the distribution of the proceeds of the Second Gas Tax as prescribed in Section 16, Article IX of the State Constitution, and the distribution of the 7th cent gas tax as prescribed by F.S. § 208.44, F.S.A., among Palm Beach County and the other four counties.
The Circuit Court upheld Chapter 63-200 and in addition held that as among the five counties their distributive shares of said gas taxes, insofar as said taxes are prorated on the basis of area of counties, would be modified to accord with the area increase or decrease of said counties.
It appears to me the monthly proration of a one-third part of the proceeds of the two cents per gallon Second Gas Tax among the counties of the state according to their respective geographical areas as such areas existed in 1942 unless modified by constitutional amendment is irrevocably fixed by the provisions of the fifty-year constitutional amendment (SJR 824, 1941, ratified in 1942, Sec. 16, Art. IX, State Const.). Similarly immutably cast is the proration of the one-third part of said tax on the basis of the then existing counties’ contributions to the cost of state roads made prior to July 1, 1931 (Ch. 15659, Acts of 1931). Similarly also, the remaining one-third part of this tax is prorated according to the population in said geographical areas of said counties as ascertained by each succeeding decennial census.
While the Constitution authorizes the Legislature to establish new counties and change county lines (Sec. 3, Art. VIII), this pre-existing authority does not authorize the Legislature by county territorial alterations to thereby indirectly modify the *364 proration formula of the two-cent Second Gas Tax later prescribed in 1942 by Section 16, Article IX.
The Legislature and electorate, respectively, submitted and ratified the Second Gas Tax amendment in contemplation of conditions then existing. Each county as it then existed had a particular geographical area, had its previous contribution to the state road system and its road bond indebtedness, and its future needs were envisioned for public highway construction and maintenance within its existing county territorial area. These elements were contemplated and evaluated in the distribution formula.
The Circuit Court ruled that so much of a county’s distributive shares of the Second Gas Tax which are required by Section 16 of Article IX of the State Constitution to service its road bond indebtedness (and presumably its later surplus commitments for bridge and highway lease-purchases) could not be reduced or withdrawn as a result of county boundary changes. But the Circuit Court did not go far enough. In addition to the foregoing necessity, the constitutional provision adopted in 1942 which became Section 16 of Article IX provides in behalf of the geographical area of each of the sixty-seven counties that the State Board of Administration shall have the power from time to time to issue refunding bonds for each unit’s road bond indebtedness to mature within the fifty-year life of the provision “ * * * and * * * secure them by a pledge of anticipated receipts [emphasis supplied] from such gasoline or other fuel taxes to be distributed to such county as herein provided” [emphasis supplied]. This language referring to “such county” indicates that the distributive shares of the Second Gas Tax prorated according to existing county areas in 1942 are irrevocably pledged to such areas for the fifty-year period for refunding purposes and the same can be anticipated according to the formula without withdrawal or reduction during said period, This view is substantiated by the following sentence in the last paragraph of the amendment:
“The Legislature shall continue the levies of said taxes during the life of this Amendment, and shall not enact any law having the effect of withdrawing the proceeds of said two (2<f) cents of said taxes from the operation of this amendment.’’ (Emphasis supplied.)
The Circuit Court was unable to hold the distributive share of any of the sixty-seven counties based on the factor of the counties’ contribution to costs to road construction prior to July 1, 1931, could be changed during the life of the constitutional provision. This restricts the distribution of this share to the areas of the sixty-seven counties regardless of subsequent county boundary changes. If this is so, and logically it must be so because it is a factor that relates to elements in esse at a particular time (July 1, 1931) which are not subject to alteration unless the constitutional provision itself is changed, equally so is the irrevocability during the fifty-year period of the factor of the proration based upon the geographical areas of the several counties, respectively, in 1942. If the Legislature is at liberty by county abolishment or realignment of county boundaries to change the operation of this factor, then all manner of departures by county alterations from the original plan will be possible. The Circuit Court overlooked the three distributive factors, viz., county area, contribution and population are cognate and interlocked. They have historical impact upon and identification with particular localities and areas, each of which has special needs including road and bridge programs and indebtedness. If one factor cannot be varied during the life of the constitutional provision, and it is conceded the factor based on the counties’ contribution prior to July 1, 1931, to the cost of constructing the state road system is beyond statutory variation and is necessarily irrevocably tied in with the identity and original area of the *365 sixty-seven counties, then it follows that distributive shares based on original county identity or area may not be varied without doing violence to the scheme of Section 16 of Article IX as a whole.
Reflection indicates the problems that will arise from statutorily changing either of the two factors of distribution based on county area and a county’s prior contribution to the road system. If a county’s territory is altered, immediately the question arises as to how its share based on its contribution is to be prorated, and even greater would be the problem if the county is entirely abolished and its territory annexed to other counties. In the particular context of this case, where water area of Lake Okeechobee is divided for county territorial purposes, the problem appears relatively simple because there are no roads in the water area but in following the precedent prescribed by the Circuit Court it will become exceedingly complex if an abolished county’s particular land area is divided among existing counties. The only realistic solution is to maintain the status quo originally commenced under Section 16 of Article IX, unless and until a complete revision of it by constitutional amendment eventuates.
In practical operation a county may be abolished or its boundaries may be changed, but this should not affect the proration of the Second Gas Tax. If some of the existing sixty-seven counties are abolished or, if not abolished their boundaries are changed, it will be necessary for the continued operation of Section 16 of Article IX that the territories of the sixty-seven counties as they existed in 1942 in effect to be superimposed upon the map of Florida and the distribution continued as now provided. As population figures change in such former county areas (it will be necessary to ascertain with each succeeding decennial census the population figures for the old county territories) they should be used to make the distribution on the basis of population.
The State Board of Administration would first use the distributive shares appertaining to said areas to service or refund the old county road and bridge bonds to which such shares are guaranteed. The surplus over, if any, would be distributed: 80% to the State Road Department for state road construction or bridge and highway lease-purchases within the superimposed old county area, and 20% to the board or boards of county commissioners having jurisdiction of the superimposed territory of the old county area to which the 20% surplus of the Second Gas Tax was guaranteed over the fifty-year period for the construction and maintenance of roads and bridges therein. In case of any dispute in this respect it would be within the authority of the State Board of Administration to remit the 20% in accordance with equitable principles to carry out the original intent of Section 16, Article IX, that is to say, so the same would be used for road needs, if any, within the superimposed territory.
To recapitulate, it is my view that the operation of Section 16 of Article IX of the State Constitution and .the proration of shares of the Second Gas Tax continues in accordance with the geographical areas of the sixty-seven counties as they existed in 1942 when Section 16 was ratified, despite subsequent county boundary alterations. Not only is the maintenance of the original identity of the sixty-seven counties required in order not to impair the debt service of the road bond indebtedness of each of the original counties and any necessary re-fundings thereof by the State Board of Administration, but also to insure that subsequent pledges of such a county’s surplus Second Gas Tax funds for the lease-purchase of highways or bridges within such county shall not be impaired, and, lastly, to guarantee that from the county accounts established originally to receive the distributive shares of the Second Gas Tax allocable to the original county units under *366 the formula each county area shall receive the benefit of any “surplus” after debt service requirements are met, to be used on the 80%-20% basis for road and bridge purposes within such territorial area as the same existed in 1942.
Under the decision of the Circuit Court, Palm Beach County as it territorially existed prior to the alteration of its boundaries will suffer a reduction of its allocation of the Second Gas Tax based on the factor of county area. The other four counties will receive portions of the amounts representing such reduction. In my judgment, this is contrary to the provisions of Section 16 of Article IX, State Constitution. Said section has reference to the original sixty-seven counties, including Palm Beach County, as they territorially existed in 1942. Subsequent county boundary changes were not intended to impair the road bond obligations of the old counties as they existed in 1942, nor was any surplus remaining after debt service to be used elsewhere for road purposes save in the original county territorial areas. Logically, there can be no “surplus” except that which remains of the distributive shares of a county’s allocation after its road bond indebtedness has been provided for. The two, that is to say, debt service and surplus over, go hand in hand for the use and benefit of the original county area. Any diversion by use of the surplus in another county is a departure from the scheme of Section 16, Article IX. But that is what will follow if amounts representing the reduction of Palm Beach County’s Second Gas Tax allocation based on area are distributed as directed by the Circuit Court. The State Road Department and the county commissioners of the other four counties will use a portion of the surplus that was heretofore used for road purposes in original Palm Beach County for road purposes in the four other counties.
It appears to me that this Court, speaking through Mr. Justice Drew in State v. Florida Development Commission, 143 So.2d 676, 680, foreshadowed a contrary view to that expressed by the Circuit Court when it said:
“ * * * The 'several counties’ contemplated must be either the units existing at the time of the constitutional levy or such counties as may by acquisition of their geographical area in part or in whole become entitled to whatever share would be attributable to that portion of the original county unit, subject to prior obligation of those funds. In the practical problem of allocating the funds due a county when its boundaries have been altered there are presented only the factual issues of population and area contained within any constituent part, and the determination of the share of the original county road contributions attributable to that part on the basis of its area and population. Thus a pledge of funds to accrue to a named county is precisely the equivalent of a pledge of funds accruing to that county area, and the power of anticipating such funds necessarily implies the authority to pledge funds which may accrue to the geographical area then within a county’s boundaries, whatever names or county governing body may in the future be attached to such area. (Emphasis supplied.)
“This result fully accords with the history and purpose of this section of the constitution, previously detailed in opinions of this Court, and with our obligation under basic principles of constitutional construction requiring effect to be given to both of the cited sections so as to preserve the power of the legislature in the field of county boundaries while superimposing thereon the restraints inherent in the subsequent enactment of the provision controlling the gas tax levy. A contrary *367 construction of the constitutional formula would permit the legislature to do indirectly that which Section 16 prohibits being done directly, by its very terms and nature as a part of the organic law. Legislative alteration of county boundaries might thus require distribution of these funds to county entities on the basis of total area within their boundaries at the time of distribution without regard to prior anticipation of such funds accruing to any part of the constituent area. Such conclusion would permit legislative manipulation of the revenue distribution and prevent effective local control; at the very least it would preclude anticipation of these proceeds on any sound basis, often conceded to be the only practical means for realization of a long-range road program of magnitude or uniformity over the state.” (Emphasis supplied.)
It is particularly noted the Court states a pledge of funds to accrue to a named county is precisely the equivalent of a pledge of funds accruing to that county area, irrespective of whatever names or county governing body may in the future be attached to such area. The Court did not restrict this language to pledges of bond funds. It is speaking of allocation of state funds to a county’s area. Most apt to the particular problem in the instant case, the Court in State v. Florida Development Commission, supra, closed its opinion by warning that county boundary changes might unconstitutionally,
“ * * * permit legislative manipulation of the revenue distribution and prevent effective local control; at the very least it would preclude anticipation of these proceeds on any sound basis, often conceded to be the only practical means for realization of a long-range road program of magnitude or uniformity over the state.”
I think the Court must have had in mind the manipulation of the “surplus” funds which were dedicated by Section 16, Article IX to the particular territories of the original sixty-seven counties for orderly long-range road programs therein mainly under State Road Department supervision. Certainly we have here a clear case of a partial diversion of “surplus” funds from their use in the original county territory to use in the territory of the four other counties by means of boundary alteration.
The foregoing principles governing the distribution of the Second Gas Tax as provided by Section 16 of Article IX do not apply insofar as the proration among the counties of the 7th cent gas tax as prescribed by F.S. § 208.44, F.S.A., is concerned. While it is true the same proration factors are used, there are distinguishing characteristics which do not place the statutory distribution of the proceeds of the 7th cent gas tax in the same irrevocable category as the constitutional distribution of the Second Gas Tax. This is so because the use of the 7th cent gas tax is not tied in with the service and refunding of road bonds of particular counties, nor is its use for road programs identified with particular territorial areas of the state for a period of fifty years. The 7th cent gas tax and its distribution may be repealed at any regular session by the Legislature, whereas the Second Gas Tax and its distribution cannot be withdrawn by statute directly or indirectly during the fifty-year period. There is nothing manifest in the legislative intent of the statute imposing the 7th cent gas tax and its distribution which identifies it immutably with particular county territories in point of time or area. The ratio of distribution of part of the 7th cent gas tax proceeds according to county areas is subject to any legislative changes of such areas by county abolishment or realignment of county boundaries since there is nothing in the nature or use of these proceeds’ distributive shares which is constitutionally restricted. Absent constitutional restriction in point of use, purpose or time, *368 the statutory intent does not preclude change of county boundaries affecting the proration of the 7th gas tax proceeds among the counties on an area basis. Being purely statutory, subject to any repeal or modification, the 7th cent gas tax distribution is outside the principles applying to the distribution of the Second Gas Tax under Section 16 of Article IX of the State Constitution.
I find no merit in other contentions urged by Appellants. The legislative change in the boundaries of the counties involved appears to be valid. I agree with the Circuit Court the changed boundary lines are susceptible of establishment by engineering surveys in the light of applicable decisions clarifying ostensibly uncertain boundary lines.